UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

VERONICA HAMPTON, ET AL

VERSUS

MCDERMOTT INTERNATIONAL, INC., ET AL

CIVIL DOCKET NO. 2:19-CV-00200

JUDGE DAVID C. JOSEPH

MAGISTRATE JUDGE THOMAS LEBLANC

## MEMORANDUM RULING

Before the Court is a MOTION FOR CERTIFICATION OF COLLECTIVES AND NOTICE (the "Motion") [Doc. 281] filed by Plaintiffs, Veronica Hampton, Sergio Hernandez, Kendrick Isom, Clarence Williams, Darien Bethancourt, and Kevin Guillory on behalf of themselves and all others similarly situated (collectively "Plaintiffs").   An Opposition [Doc. 355] was filed by Defendants, McDermott International, Ltd., and CB&I, LLC (collectively "Defendants"), to which Plaintiffs filed a Reply. [Doc. 357]. At Defendants' request, the Court heard oral argument on the Motion on April 3, 2024.   [Doc. 358].   After careful consideration, and for the reasons set forth below, Plaintiffs' Motion is DENIED.

## FACTUAL BACKGROUND

Defendants are engaged in the energy and construction industry and were retained to construct the Cameron Liquefaction Plant (the "Facility"), a liquified natural gas facility located on a 502-acre plot of land in Hackberry, Louisiana. [Doc. 281-1, p. 8; Doc. 355-1, p. 1].   At the height of the construction project, approximately twelve thousand people were employed by the Defendants at the Facility.  [Doc. 355-

2, pp. 12-13].  Construction workers employed by the Defendants worked in three shifts beginning at 6:00 a.m., 7:30 a.m., and 7:00 p.m.  [Doc. 355-2, pp. 10-11].

Plaintiffs are all former employees of Defendants who worked at the Facility. [Doc. 281-1, p. 8].  Though Plaintiffs worked in different "construction" positions, they were all paid hourly wages and usually worked six 10-hour shifts per week.  [Doc. 281-1, p. 9].  As part of their jobs, Plaintiffs allege that they were required to attend daily safety meetings before their scheduled shift start time.  [Doc. 281-1, pp. 9-10]. According to Plaintiffs, these daily "pre-start" meetings generally lasted fifteen to twenty minutes and resulted in "off-the-clock" work for which they were not compensated.  [Doc. 281-1, p. 10].

On February 15, 2019, Plaintiffs, on behalf of themselves and all others similarly situated, filed the instant action pursuant to the Fair Labor Standards Act (the "FLSA") seeking unpaid overtime wages from Defendants.  *See* 29 U.S.C. § 207. [Doc. 1].  On October 13, 2021, the Court directed the parties to engage in a period of discovery for the purpose of determining whether the Court should authorize notice in this matter as an FLSA collective action, which discovery period was extended multiple times at the request of the parties.  [Docs. 195, 209, 213, 237, 326, 328].

After conducting discovery and several amendments to their Complaint, Plaintiffs' claims are now limited to their alleged entitlement under the FLSA to unpaid wages for the daily pre-start safety meetings that Defendants allegedly

required them to attend before their scheduled shift start time.[1] *See* Fourth Amended Complaint (the "Complaint"). [Doc. 301]. Plaintiffs claim that Defendants had a common practice of conducting the safety meetings prior to the scheduled shift start time. [Doc. 301, p. 6]. In their Complaint, Plaintiffs seek certification of a collective action under § 216(b) of the FLSA as to each of the named Plaintiffs as representatives of other employees with the same job descriptions who were allegedly required to attend "off-the-clock" safety meetings. [Doc. 301, pp. 13-21]. Specifically, Plaintiffs request that: (i) lead Plaintiff Veronica Hampton represent a putative collection of all Light Equipment Operators;[2] (ii) Sergio Hernandez represent a putative collection of all Pipefitters and Pipefitter Helpers; (iii) Kendrick Isom represent a putative collection of all Painters; (iv) Kevin Guillory represent a putative collection of Riggers; [3] and (v) Darien Bethancourt represent a putative collection of all Millwrights. [Doc. 281-1].

Defendants filed the instant Motion on April 18, 2023, asserting that certification should be granted because the putative members of Plaintiffs' five

---

[1]   Plaintiffs assert that they were only compensated for their 10-hour shift time, not their clock-in and clock-out times, and thus they were not compensated for the pre-start safety meeting that allegedly occurred before the start of each shift. [Doc. 357, p. 9].

[2]   Lead Plaintiff, Veronica Hampton, originally claimed she was employed as a "Forklift Operator." [Doc. 154, p. 9]. In her deposition testimony, however, Hampton stated that her actual position title was "Light Equipment Operator." [Doc. 357-1, pp. 9-10].

[3]   Plaintiffs also previously sought to have Plaintiff, Freddie Jenkins, represent a putative collective of all Riggers at the Facility. However, Jenkins' claims have since been dismissed. [Doc. 271]. Instead, Plaintiffs now propose Kevin Guillory to represent the putative collective of Riggers. [Docs. 280; 281-1].

collective action members are "similarly situated" within the meaning of § 216(b).[4] [Doc. 281-1].

<u>LAW AND ANALYSIS</u>

## I.    The Fair Labor Standards Act

The Fair Labor Standards Act (the "FLSA") provides that employers must pay their employees "one-and-a-half times their normal wages for hours worked in excess of forty [hours] per week." *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) (citing 29 U.S.C. § 207(a)).  An employee may sue an employer for violating overtime compensation of the FLSA either individually, or collectively on behalf of himself or herself and "other employees similarly situated."  29 U.S.C. § 216(b).  District courts must exercise discretion to certify collective actions and order notice to putative collective members where appropriate.  *Swales v. KLLM Transp. Servs., L.L.C.,* 985 F.3d 430, 436 (5th Cir. 2021).

Prior to the recent Fifth Circuit decision in *Swales,* in determining whether to certify a collective action under the FLSA, district courts in this circuit generally applied the *Lusardi* two-step approach, consisting of a "notice and conditional certification stage" and a "decertification stage." *Bancroft v. 217 Bourbon, LLC*, 2022 WL 19762095 at *3 (E.D. La. 2022) (citation omitted).  At the first stage, courts

---

[4]    Each putative collective is defined as: all persons employed by Defendants at the Facility who "were required to engage in pre-start safety meetings before the start of their scheduled shift during the past four years and 44 weeks who were not compensated … for all hours worked in excess of forty (40) hours per week."  [Doc. 281-1, p. 6].

determined, based on the pleadings and affidavits submitted, whether the "putative [collective] members were together victims of a single decision, policy, or plan." *Swales*, 985 F.3d 430, 437 (5th Cir. 2021) (*citing Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)).  Step two occurred after discovery, often after a motion to decertify.  *Id.*  There, with the benefit of full discovery, courts would make a second and final "'determination, using a stricter standard,' about whether the named plaintiffs and opt-ins [were] 'similarly situated' and [could] therefore proceed to trial as a collective."  *Id.* (*citing Thiessen*, 267 F.3d 1095, 1102 (10th Cir. 2001)).

However, in *Swales*, the Fifth Circuit explicitly rejected the two-step certification process used in *Lusardi v. Xerox Corporation*, 118 F.R.D. 351 (D.N.J. 1987), and provided new guidance to determine whether putative collective action members are "similarly situated."  *Id.* at 434.  Instead of the "conditional certification" test used in *Lusardi* — which the Fifth Circuit noted "has no anchor in the FLSA's text or in Supreme Court precedent interpreting it" — *Swales* held that "a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated' … [and] should authorize preliminary discovery accordingly."  *Id.* at 441.  Additionally, the Fifth Circuit noted that district courts must consider: (i) "the FLSA's text, specifically § 216(b) which declares (but does not define) that only those 'similarly situated' may proceed as a collective;" and (ii) "the Supreme Court's admonition that while a district court may 'facilitate notice to potential plaintiffs' for

case-management purposes, it cannot signal approval of the merits or otherwise stir up litigation." *Id.* at 434.  These requirements "are the only binding commands on district courts," but "they are unequivocal." *Id.*

To decide whether a group of employees is similarly situated under *Swales*, the court must consider "whether merits questions can be answered collectively." *Id.* at 442.  "After considering all available evidence, the district court may conclude that [p]laintiffs and [o]pt-ins are too diverse a group to be 'similarly situated' for purposes of answering" the relevant legal questions on the merits. *Id.* at 443.  Employees are likely not similarly situated if answering the merits questions "requires a highly individualized inquiry into each potential opt-in's circumstances." *Id.* at 422.  District courts have "broad, litigation-management discretion" and must "consider all of the available evidence" in determining whether and to whom notice should be issued. *Id.*  Thus, district courts must "rigorously scrutinize the realm of 'similarly situated' workers" before certifying a collective action to ensure "that the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Id.* at 434.  The Fifth Circuit has explicitly stated post-*Swales* that "courts may still find it useful to consider the *Lusardi* factors to help inform or guide the similarly situated analysis." *Loy v. Rehab Synergies, L.L.C.*, 71 F. 4th 329, 337 (5th Cir. 2023).  Importantly, "it is the plaintiffs' burden to establish they are similarly situated" with the putative collective. *Id.* at 336 (citing *Swales*, 985 F.3d 430, 443 (5th Cir. 2021)).

## II.    The Similarly Situated Requirement of FLSA Collective Certification

Here, Plaintiffs seek to certify five putative collectives with respect to five categories of "laborers" employed by Defendants at the Facility from August 11, 2018, to present, consisting of: (i) Light Equipment Operators, represented by Veronica Hampton; (ii) Pipefitters and Pipefitter Helpers, represented by Sergio Hernandez; (iii) Painters, represented by Kendrick Isom; (iv) Millwrights, represented by Darien Bethancourt and (v) Riggers, represented by Kevin Guillory.  [Doc. 301].

In their collective allegations as to these groups of laborers, Plaintiffs point out that they are similarly situated to the putative collective members because they "usually worked six [ten]-hour shifts per workweek … were typically only paid for their scheduled shift times … [and] worked in excess of their scheduled hours … by attending mandatory safety meetings prior to the start of their shifts for which they were not compensated." [Doc. 281-1, p. 9]. Applying the factors from *Lusardi*'s second step, in sum, Plaintiffs argue that they are similarly situated because the putative collective members were employed in the same positions, paid in the same manner, worked in the same facility, and all had to attend the mandatory pre-start safety meetings; thus, the only question for the Court is whether the pre-start meetings occurred "off-the-clock." [Doc. 281-1, p. 15].  In addition, they urge that the Court should not determine the merits or make credibility determinations as to each Plaintiff.  Instead, they urge that the frequency of any meetings occurring before the start of shift time should be reserved as a damages question for the jury.  [*Id.* at p. 16].

Defendants counter that (i) Plaintiffs do not have sufficient evidence to meet their burden that they are similarly situated to their respective putative collectives regarding: (a) whether they attended unpaid pre-start meetings that began before their scheduled shift start times or (b) if so, the frequency at which that occurred; (ii) Plaintiffs provide no evidence that they are similarly situated with other members of their putative collectives; (iii) the evidence indicates that determining whether putative collective members were required to attend safety meetings prior to their shift would require a highly fact-specific and individualized inquiry; and (iv) Plaintiffs' testimony proves there is no evidence of a common decision, policy, plan, or practice of the alleged "off-the-clock" pre-start meetings.  [Doc. 355].

The Court finds Defendants' arguments persuasive.  Although *Swales* invalidated the two-step *Lusardi* approach, district courts continue to apply the *Lusardi* factors to determine whether plaintiffs have met their burden to demonstrate that putative collective action members are "similarly situated."[5]  *Brunet v. GB Premium Octg Servs. LLC*, 2022 WL 17730576 at *3 (S.D. Tex. Dec. 1, 2022) *report and recommendation adopted sub nom.  Brunet v. GB Premium OCTC Servs., LLC*, No. 2023 WL 2186641 (S.D. Tex. Feb. 22, 2023) (*citing Fuller v. Jumpstar Enterprises, LLC*, 2021 WL 5771935, at *3 (S.D. Tex. Dec. 6, 2021) (collecting cases)).  Finding the

---

[5]     Though it chooses to analyze Plaintiffs' Motion using the *Lusardi* factors, the Court emphasizes that the use of the *Lusardi* factors is not mandatory, and the Court has "broad, litigation-management discretion," "cabined by the FLSA's 'similarly situated' requirement." *Loy v. Rehab Synergies, L.L.C.*, 71 F.4th 329, 336–37 (5th Cir. 2023) (citing *Swales*, 985 F.3d at 443).

*Lusardi* factors helpful in its analysis, this Court will consider: (i) "[the] disparate factual and employment settings of the individual plaintiffs;" (ii) "the various defenses available to [the] defendant which appear to be individual to each plaintiff;" and (iii) "fairness and procedural considerations," in determining whether certification is appropriate as to Plaintiffs' putative collectives. *Swales*, 985 F.3d 430, 437 (5th Cir. 2021) (*citing Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)). The Court considers each factor in turn.

### A.   *Factual and Employment Settings of Plaintiffs*

The first *Lusardi* factor "assesses the opt-in plaintiffs' job duties, geographic locations, supervision, and salary to determine if the opt-ins are similarly situated." *Cortez v. Casa do Brasil, LLC.*, 2022 WL 17811963 at *4 (S.D. Tex. Dec. 19, 2022) (*citing Snively v. Peak Pressure Control, LLC.*, 314 F. Supp. 3d 734,739 (W.D. Tex. 2018)). Courts in the Fifth Circuit have consistently found that — absent evidence of a common plan, policy, or practice — the first factor weighs against a "similarly situated" finding when disparate working conditions necessitate individual determinations of FLSA liability. *See, e.g., Loy v. Rehab Synergies, L.L.C.*, 71 F. 4th 329, 339 (5th Cir. 2023) (holding "evidence supported conclusion that [p]laintiffs were *all* subject to [a] practice or pattern of knowingly countenancing or expressly encouraging off-the-clock work") (emphasis added); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 579 (E.D. La. 2008) (finding plaintiffs who "offered proof of largely individual employment circumstances" were not similarly situated); *Boudreaux v. Schlumberger Tech. Corp.*, 2022 WL 17422013 at *7 (W.D. La. Nov. 14,

2022), *report and recommendation adopted sub nom.  Boudreaux v. Schlumberger Tech. Corp.*, No. CV 6:14-2267, 2022 WL 17417265 (W.D. La. Dec. 5, 2022) (concluding plaintiffs were not similarly situated because a lack of "significant common evidence" meant FLSA liability could not be determined on a collective basis); *Bancroft v. 217 Bourbon, LLC*, No. CV 21-545, 2022 WL 19762095 at *5 (E.D. La. Jan. 26, 2022) (declining to find additional categories of restaurant employees "similarly situated" because "[e]ach category may have been subject to different pay rates and policies and working conditions that would render them not similarly situated to the bartenders"); *Hamm v. Acadia Healthcare Co., Inc.*, 2022 WL 2713532 at *3 (E.D. La. July 13, 2022) (finding supervisor and supervisees similarly situated because the evidence clearly indicated "that the policies in question apply equally to each member of the proposed collective"); *Fuller v. Jumpstar Enterprises, LLC*, 2021 WL 5771935 at *7 (S.D. Tex. Dec. 6, 2021) (holding plaintiffs that had similar job titles and were paid the same were not similarly situated in part because their working hours varied and "proceed[ing] on a collective basis … 'would quickly dissolve into a cacophony of individual actions'") (citing *Swales*, 985 F. 3d at 442).

Here, there is no evidence that Defendants – either formally or informally – had a common policy or practice of requiring employees to attend safety meetings prior to their scheduled shift start time.[6]  The declarations submitted by Plaintiffs

---

[6]     Plaintiffs argue Defendants had a "common practice" at the Facility of conducting safety meetings before shift times based on emails from Lindsay Comeaux, the Contracts Management & Special Projects Employee. *See* [Doc. 289-1].  The emails dictate that a brief safety discussion must be covered "before beginning work activities" and that the safety packet must be completed at the "start of every shift."  *See* [*Id.*].  According to Plaintiffs, the

taken with the submitted deposition testimony, demonstrate that each employee's experience attending safety meetings at the Facility were highly individualized.  For example, named Plaintiff and proposed representative, Veronica Hampton, who testified that she *never* attended safety meetings prior to her scheduled shift time,[7]

---

emails instructing supervisors to conduct the safety meetings "at the start of every shift" are "clear evidence" of this "common practice."  [Doc. 281-1, p. 16].

But Plaintiffs' interpretation of these emails is contrary to their plain language.  Nor is it reasonable to infer from these emails that Defendants were encouraging safety meetings to take place before the scheduled shifts or, even if so, that this policy was enacted throughout the Facility.

[7]      The Court notes that Hampton's own admission casts doubt on whether she has a valid FLSA claim at all.  Many Circuit courts and at least one district court within the Fifth Circuit has granted a "Motion to Decertify" based on a lead plaintiff without a viable FLSA claim. *See Mondeck v. LineQuest, LLC*, 2021 WL 7184965, at *4 (W.D. Tex. Nov. 5, 2021), report and recommendation adopted, 2021 WL 7184964 (W.D. Tex. Dec. 14, 2021).  *See also Camesi v. Univ. of Pittsburg Med. Ctr.*, 729 F.3d 239, 248 (3rd Cir. 2013) ("[I]t would be anomalous to conclude that [lead plaintiffs] are 'similarly situated' to opt-in plaintiffs who, unlike [lead plaintiffs], have actually retained their individual claims. Without any personal stake in the matter, [lead plaintiffs] should not be permitted to represent opt-in plaintiffs.") (citations omitted); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 878 (6th Cir. 2012) ("Just as opt-in plaintiffs are not similarly situated to a lead plaintiff if their claims are dismissed ... a lead plaintiff cannot be similarly situated and represent opt-in plaintiffs without a viable claim. *In re Family Dollar FLSA Litig.*, 637 F.3d at 519. Since [lead plaintiff] cannot meet her burden that she is similarly situated to the opt-in plaintiffs because her FLSA claims were dismissed, decertification was proper.") (internal citation omitted); *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 519 (4th Cir. 2011) ("Without a viable claim, [lead plaintiff] cannot represent others whom she alleged were similarly situated."); *see also Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1208 n.14 (10th Cir. 2015) (noting that "persuasive authority from our sister circuits suggests that if [lead plaintiff] had no viable FLSA claim, she was not an appropriate representative in any event for a hypothetical class of similarly situated employees"). Thus, her admission casts serious doubt as to whether she can be a collective representative, jeopardizing the whole proposed light equipment operator collective.

The Court further notes that though Hampton alleged in the Complaint that she was required to attend pre-start safety meetings "off the clock," her supervisor, Elbert Dwight Trautmann, testified "off the clock" pre-start meetings never happened in his crew and to his knowledge, not with any other crew either. [Doc. 301, pp. 7-8; Doc. 355-9, pp. 10-11].  In addition, in his declaration, Reynaldo Milton, who worked with and/or supervised a Light Equipment Operator crew that included Hampton, testified that pre-start meetings never started before the scheduled shift start time. [Doc. 355-13].

cannot be similarly situated to other Light Equipment Operators and Forklift Drivers that claim that they were occasionally required to attend safety meetings before their shift.  [Doc. 355-3, p. 11]; *see e.g.,* [Doc. 355-46;[8] Doc. 355-11, pp. 2-8, 14, 17-19;[9] Doc. 281-6[10]]. Additionally, Sergio Hernandez, proposed Pipefitter and Pipefitter Helpers' representative, who worked under two different supervisors — one that started meetings before his shift and one that did not — cannot be similarly situated to Pipefitters or Pipefitter Helpers that only worked under one of his two supervisors.[11]

---

[8]     The deposition of Anthony San Nicolas reveals that he was hired as a rigger but also spent time working as a Light Equipment Operator. [Doc. 355-46, p. 2].

[9]     Carl Scott claimed, in his deposition, that he attended meetings beginning 15 minutes before his scheduled shift start time except for potentially varied safety meeting start times in 2015.

[10]     In the declaration of Forklift Operator Lance Simon, he alleged that safety meetings began 10-15 minutes before the start of his shift.  [Doc. 281-6, pp. 39-40].  Opt-in Light Equipment Operator Plaintiff, Ashley Price, in her declaration, alleged pre-start safety meetings regularly occurred 10 minutes before the start of her shift [Doc. 281-6, p. 4]; opt-in Plaintiff, Bryson Solomon claimed in his declaration that the safety meetings occurred regularly 20 minutes before the start of his shift. [Doc. 281-6, p. 5].

[11]     In his deposition, Hernandez testified that his first supervisor, Tommy Smith, started the safety meetings "on time every time," but that his second supervisor would start the meetings "a few minutes before" his shift started.  [Doc. 357-5, pp. 35-36].

Though Hernandez could possibly serve as a representative to the Pipefitters who worked under his supervisor that started the meetings "a few minutes" before his shift, there is still no evidence that Hernandez and other Pipefitters or Pipefitter Helpers that worked under this supervisor were subject to a common practice.  First, Hernandez stated that he has no knowledge of the experience of any Pipefitters or Pipefitter Helpers other than those on his crew — which consisted of nine to eleven people in various positions including Pipefitter, Pipefitter Helpers, and Welders.  [Doc. 357-5, pp. 39-40, pp. 43-44].  Second, Hernandez testified that his supervisor would sometimes start the meetings before everyone got there because "[p]eople [were] always late."  [*Id.* at pp. 37-38].  Finally, Plaintiffs have submitted no additional evidence from other employees at the Facility that worked under this same supervisor.  Thus, Hernandez cannot be "similarly situated" even to those in this narrower category of employees.

[Doc. 357-5, p. 35].   Likewise, Darien Bethancourt, proposed Millwright collective representative, who alleged that the pre-start safety meetings began 30 minutes before the start of his crew's shifts[12] cannot be similarly situated to members of his crew who routinely "badged" into work less than 15 minutes before their scheduled start time. [Doc. 301, p. 12; Doc. 355-58, pp. 8-18 (scan-in records for the month of July 2017)].[13]

---

It is also worth noting that Hernandez's Complaint, in which he alleges he was required to attend pre-start meetings usually starting 15 minutes before his shift, conflicts with his deposition testimony about frequency and timing of these alleged "off the clock" meetings. *Compare* [Doc. 301, p. 9] *with* [Doc. 357-5, pp. 35-36].

[12]    The Court also notes an inconsistency in Darien Bethancourt's testimony as he stated in his deposition that his crew safety meetings only started before his shift "three times" despite saying in the Complaint that these meetings *usually* occurred 30 minutes before his shift.  *Compare* [Doc. 355-17, pp. 17, 21; Doc. 347-2, p. 20] *with* [Doc. 301, p. 12].

In addition, Jaime Chavez, who supervised Darien Bethancourt, testified that that throughout his employment, pre-start meetings always began at or after the scheduled shift start time. [Doc. 355-18].

[13]    To enter the Facility, employees scanned a badge that unlocked a turnstile, allowing them to enter the site.  [Doc. 355-3, pp. 7-8].  Defendants tracked employee badge scans in real time via a Lenel badge scan computer system.  [Doc. 355-4, pp. 3-4].  After badging in, employees would still have to travel to their respective meeting areas, which took up varying amounts of time depending on crew meeting location.  For example, proposed Pipefitter collective representative, Sergio Hernandez, testified that his daily journey from the turnstiles to the print shack, where his daily pre-start meetings were held, took him about 8-10 minutes. [Doc. 357-5, pp. 27-28].

Interestingly, though Hernandez testified that his pre-start meetings began 10 minutes before his scheduled shift start time, his badge scan data shows he badged in less than 15 minutes before his scheduled shift start time when he was in his second supervisor's crew. [Doc. 355-58, pp. 1-7].  This occurred 37 out of the 45 badge scan entries submitted into evidence.  *Id.*  The badge entry time combined with the estimated travel time to the meeting location would make alleged pre-start meetings that began 10 minutes before his shift highly unlikely.

Moreover, admissions in Declarations from employees within the same proposed collective demonstrate that FLSA liability would have to be determined on an individual basis. Of the Pipefitters, Carl Dixon stated that he was required to attend the meetings every day 30 minutes before his shift started; Vincent Hunt stated that his safety meetings occurred 15 minutes before his shift started but only about ten times, while Phillip Nation alleged safety meetings started at least five minutes before his crew's shift.  [Doc. 281-6, p. 9; Doc. 281-6, p. 47; Doc. 281-6, p. 45]. Meanwhile, opt-in Plaintiff James Browning testified in deposition that pre-start meetings always started at or after the start of shift. [Doc. 355-33, pp. 3-4]

Similarly, Kendrick Isom, in his deposition, stated that he attended meetings that started 30 minutes before the start of his shift,[14] while in declarations submitted by other Painters, they allege they were required to attend meetings that started anywhere from five to twenty minutes before their scheduled shift start time.[15]  [Doc.

---

[14]    Isom later in his deposition wavered as to the length of time spent off the clock during these safety meetings; he changed his answer to anywhere from 30 minutes to 15 minutes. [Doc. 355-20, p. 20].

In addition, badge scan evidence shows that members of Isom's crew routinely badged into the site less than 15 minutes before their scheduled shift start time. [Doc. 355-58, pp. 21-52].

[15]    Even if the Declarations were probative as to the Complaint's collective action allegations, the Court gives them limited weight because: (i) they contain inconsistencies with sworn deposition testimony of the declarants; (ii) they each appear to have been drafted by the same person; and (iii) otherwise contain few specifics indicative of reliability.

For example, in his Declaration, named Plaintiff Sergio Hernandez claimed that safety meetings before his shift were a regular occurrence, but testified in his deposition that pre-start safety meetings "did not happen every day," and that they began only after a change in supervisors.  [Doc. 310-4 – attached to Reply to Response to Motion for Partial Summary Judgment]; [Doc. 357-5, pp. 34-35].  Proposed Painter collective representative Kendrick Isom's Declaration states that he attended meetings before his shift "daily," but testified in his deposition that his Monday meetings almost always started at the beginning of his

357-3, pp. 19, 80-81; Doc. 281-6, p. 29; Doc. 281-6, p. 37; Doc. 281-6, p. 35].  Therefore, rather than bolster Plaintiffs' argument, the Declarations further illustrate that the putative collective members are not similarly situated to the proposed representatives nor are the proposed collective members similarly situated to each other.

The same rings true with regard to the putative rigger collective.  Proposed rigger collective representative, Kevin Guillory, in his declaration, stated that safety meetings regularly occurred 10-15 minutes before his scheduled shift. [Doc. 281-17]. In the declaration of opt-in rigger plaintiff, Cameron Johnson, he alleged that safety meetings would occur five to 10 minutes once or twice a week before the start of his shift. [Doc. 281-6, p. 6].  In contrast, opt-in rigger plaintiff, Curtis Leonard, testified in deposition that his safety meetings would start at his shift time and that for some span of time, he attended pre-start safety meetings with Kevin Guillory. [Doc. 357-15, pp. 19, 23, 25].[16]

---

scheduled shift.  [Doc. 310-5 – attached to Reply to Response to Motion for Partial Summary Judgment]; [Doc. 357-3, pp. 28-29]. Isom also indicated in his deposition that his Declaration incorrectly stated his shift start time.  [Doc. 357-3, pp. 29-30]. Similarly, Painter and putative collective member, Jonathan Bethancourt, swore in his Declaration that: (i) he "conducted" the safety meetings; and (ii) that his shift time was 6:00 a.m. to 5:30 p.m.  However, he testified in his deposition that he never "conducted" the safety meetings, but only attended them, and that his hours on the Declaration were incorrect. *Compare* [Doc. 310-5 – attached to Reply to Response to Motion for Partial Summary Judgment] *with* [Doc. 357-4, pp. 22-34]. Importantly, although the Facility operated twenty-four hours, there is not a single declaration from any proposed collective member that worked the night shift.  *See* [Doc. 281-6].  Moreover, the declarations submitted by Plaintiffs are all structured the same, usually contain the same generic information (name, dates of employment, title, shift time, etc.), and are the same length.  *See, e.g.,* [Doc. 281-6; Doc. 281-17].

[16]     The Court also notes that Leonard's deposition contains internal inconsistencies. Later in the same deposition referenced above, when questioned about his declaration

Other district courts in the Fifth Circuit have found that "[w]here there are legitimate differences between putative collective-action members, the first factor does not weigh against a similarly situated finding *unless* FLSA liability turns on the identified differences. *Torres v. Chambers Protective Services, Inc.*, 2021 WL 3419705 at \*5 (N.D. Tex. Aug. 5, 2021) (citing *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014)), *aff'd*, 656 F. App'x 688 (5th Cir. 2018) (emphasis added).   Here, Plaintiffs and the putative collective members had different shift times, different supervisors, and worked on different crews at different locations within the over-five-hundred-acre Facility.   Though, according to Plaintiffs, "these are minor differences and nothing more than red herrings that do not prevent a similarly situated finding because they are unrelated to pre-start safety meeting attendance," the evidence indicates that these are the exact differences that are determinative of whether Defendants' employees were required to attend pre-start safety meetings.  [Doc. 281-1, p. 20].  *See e.g.* [Doc. 357-1, pp. 40-41, 50-51] (Veronica Hampton stating that she was never required to attend meetings before her shift and that she has no personal knowledge whether people outside of her crew were required to attend "off-the-clock" safety meetings); [Doc. 357-5, pp. 43-44, 35] (Sergio Hernandez noting that he was only required to attend meetings before his shift when he switched supervisors and has no knowledge of any employee's experience outside of his own crew); [Doc. 357-2, pp. 29] (Darien Bethancourt noting that he has no

---

statement that he had to attend a pre-start meeting about ten minutes before his shift started, Leonard responded that these meetings occurred "every day."  [Doc. 357-15, p. 30].

knowledge whether other Millwright crews followed the same meeting policies); [Doc. 357-4, pp. 62-17] (Kendrick Isom stating that because he worked on the "live side" of the Facility, he has no personal knowledge of whether Painters on the "new construction" side had meetings); [Doc. 357- p. 41] (Kevin Guillory stating that he did not have any knowledge about the experiences of riggers who worked on the "live side" of the Facility and noting that he can only speak for what he went through regarding having to work "off-the-clock" early).  Because the pre-start safety meetings are the basis of Plaintiffs' FLSA claims, and Plaintiffs have not produced sufficient evidence to show that these meetings were required of each of the proposed collective members, the Court finds that the first factor weighs heavily against finding Plaintiffs' putative collectives to be "similarly situated."

### B.    *Individual Defenses*

Similarly, because of the disparate circumstances surrounding each employee's experience at the Facility, the individual defenses factor weighs against finding the Plaintiffs similarly situated to others in the proposed collectives.  When analyzing defendant's individualized defenses, "courts look to whether the defendant's defenses are so individualized that it is inefficient or unmanageable to proceed with a representative class." *Cortez v. Casa do Brasil, LLC*, 2022 WL 17811963 at *4 (S.D. Tex. Dec. 19, 2022).  "Thus, whether an employee argues that one defense applies to all plaintiffs is beside the point; the fact that an individualized inquiry will likely be necessary weighs strongly in favor of decertification." *Torres v. Chambers Protective Services, Inc.*, 2021 WL 3419705 at *7 (N.D. Tex. Aug. 5, 2021) (internal citations

omitted); *see also Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 586 (E.D. La. 2008) (noting that the disparities of plaintiffs' job duties would require the defendant "to pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each of the plaintiffs … [which] is tantamount to conducting multiple individual trials on the merits and is the anthesis of a collective action) (citations omitted); *Boudreaux v. Schlumberger Tech. Corp.*, 2022 WL 17422103 at *8 (declining to issue notice of collective action where "the disparate factual scenarios surrounding the different work environments and job responsibilities … would require a highly fact-specific analysis of each plaintiff's duties and responsibilities to determine FLSA liability").

Here, given that the experience of the five proposed collectives varied depending on their crew, their supervisor, and even the day, an individualized inquiry would be required to determine: (i) whether each collective member was required to attend safety meetings before his or her shift started; (ii) how early each meeting started; and (iii) how often each member attended meetings before the start of his or her shift. Because this would undermine the judicial efficiency collective actions seek to promote, the individual-defenses factor weighs against proceeding as a collective action.

### C.    *Fairness and Procedural Considerations*

Under the third and final factor, "the Court considers the primary objectives of the FLSA § 216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged

activity." *Snively v. Peak Pressure Control, LLC.*, 314 F. Supp. 3d 734, 743 (W.D. Tx. 2018).

Here, the third factor also weighs against certification.  While each member of the five proposed collectives each had the same job title, generally worked 10-hour shifts six days a week, and were subject to the same overtime policy, the similarities end there.  The evidence before the Court demonstrates that whether employees at the Facility were required to attend "off-the-clock" safety meetings varied from crew to crew, supervisor to supervisor, and day to day.  As appropriately noted by another court, where, as here, "there are significant differences in employment experiences, the procedural advantages of a collective action evaporate," and the court's ability to render "a just verdict on the merits is seriously undermined." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp 2d 567, 568 (E.D. La. 2008).  Moreover, certifying Plaintiffs' putative collectives would result in exactly the highly individualized and factual determination that § 216(b) seeks to avoid.

After considering the Fifth Circuit's guidance in *Swales*, and its application of the *Lusardi* factors as guideposts in its analysis, the Court finds that the disparate factual employment settings of the Plaintiffs, the defenses available to the Defendants, and the fairness and procedural considerations, all weigh against finding Plaintiffs "similarly situated" to the putative collective action.[17]

---

[17]   Plaintiffs raise the argument that the case involves merits issues that should be decided after merits discovery at summary judgment or trial because the safety meetings either occurred "off-the-clock" or they never did. However, *Swales* instructs that considering whether merits questions can be answered collectively assists a court in deciding whether notice is necessary and verifies that any notice given will be sent to potential plaintiffs. *Swales v. KLLM Transp. Servs., L.L.C.,* 985 F.3d 430, 442 (5th Cir. 2021). Importantly,

### III.    Equitable Tolling

In their Motion, Plaintiffs argue that the Court should equitably toll the statute of limitations for the putative collective members during the period of October 1, 2021, to May 11, 2022, and for the period of January 23, 2020, to July 16, 2020. [Doc. 281-1, pp 28-30].  Equitable tolling preserves a plaintiff's claim when a strict application of the statute of limitations would be inequitable. *United States v. Patterson*, 211 F.3d 927, 930 (5th Cir. 2000).  This doctrine provides a very narrow exception to the FLSA statute of limitations, for which "a plaintiff must show: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Sandoz v. Cingular Wireless, L.L.C.*, 700 F. App'x 317, 320 (5th Cir. 2017) (citing *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016)).  "This standard requires 'reasonable diligence,' not 'maximum feasible diligence,' and an extraordinary circumstance that derives from some 'external obstacle to timely filing … beyond [the plaintiff's] control,' not from self-inflicted delay." *Id.*; *see also Holland v. Florida*, 560 U.S. 631, 653 (2010).

As discussed on the record during oral argument, if the Court denied certification, Plaintiffs still request that the statute of limitations be tolled forty-five (45) days from the denial of their Motion.  Defendants did not oppose this request.

---

"When a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the "similarly situated" analysis and is likely to send notice to employees who are not potential plaintiffs. In that circumstance, the district court risks crossing the line from using notice as a case-management tool to using notice as a claims-solicitation tool." *Id.*

Accordingly, the Court will grant Plaintiffs' tolling request and allow any additional individual claims to be filed within 45 days of the issuance of this ruling.

<u>CONCLUSION</u>

Considering the evidence and applicable law, the Court finds that Plaintiffs and the proposed collective members are not "similarly situated" within the meaning of the FLSA.  Specifically, the Court finds Plaintiffs have failed to meet their burden and show that: (i) Defendants had a common plan, policy, or practice of requiring employees to attend meetings prior to their scheduled shift start time; or (ii) that the named Plaintiffs are similarly situated to the proposed collective action members they purport to represent.  At bottom, Plaintiffs have failed to establish a collective basis that the Court could use to determine when the pre-start safety meetings occurred, how many pre-shift meetings the collective members were required to attend, or how much overtime is due.  Instead, individual testimony would be needed from each employee to determine if, and when, they worked uncompensated overtime. After careful consideration and given the broad case-management discretion invested in district courts for FLSA claims, this Court denies Plaintiffs' Motion.

For the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiffs' MOTION FOR CERTIFICATION OF COLLECTIVES AND NOTICE [Doc. 281] is DENIED.

IT IS FURTHER ORDERED that any additional individual claims under the FLSA must be filed within 45 days of this ruling.

IT IS FURTHER ORDERED that this matter is referred to Magistrate Judge Thomas LeBlanc for a scheduling conference to determine a time and date for the parties to participate in a settlement conference.

THUS, DONE AND SIGNED in Chambers on this 17th day of April 2024.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE